## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DELAWARE RIVER JOINT TOLL** | **: CIVIL ACTION** |
| **BRIDGE COMMISSION** | : |
| | : |
| **v.** | **: NO. 19-2978** |
| | : |
| **W. GERALD OLEKSIAK** | : |

## MEMORANDUM

**KEARNEY, J.** **August 2, 2019**

The Compact Clause of the United States Constitution permits the Commonwealth of
Pennsylvania and State of New Jersey to surrender portions of their sovereignty under a Compact's
terms to form a bi-state entity. In 1934, elected representatives of the Commonwealth and New
Jersey agreed to form the Delaware River Joint Toll Bridge Commission under the Compact
Clause. The elected representatives specifically granted all powers, except those inconsistent with
the Constitution and their state constitutions, to the Bridge Commission so long as it exercised
those powers in accord with its Compact's purposes including maintaining and repairing the
Bridge Commission's facilities. The elected representatives specifically reserved its local
municipalities' police power on the roads approaching the bridges.

The Bridge Commission is now completing a several hundred-million-dollar project at the
Scudder Falls Bridge in Bucks County, Pennsylvania. Now close to the end of constructing new
buildings to house its employees, the Commonwealth's Secretary of the Department of Labor and
Industry is directing his Department's inspectors to preclude the Bridge Commission's contracted
elevator company from activating or repairing elevators in the Bridge Commission's new
buildings. After evaluating affidavits and oral argument which all parties agree constitutes the

entire record for injunctive relief, we today grant the Bridge Commission's Motion to preliminarily enjoin the Commonwealth's Secretary from further interfering, impeding or delaying the activation and repair of elevators in the Bridge Commission's buildings.

## I.    Adduced facts at our preliminary injunction hearing.

The Commonwealth of Pennsylvania and State of New Jersey created the Delaware River Joint Toll Bridge Commission in 1934 as a "bi-state entity" governed by a Compact under the Compact Clause of the United States Constitution.[1] The Bridge Commission maintains bridges and roadways crossing the Delaware River between the Commonwealth and New Jersey including the Scudder Falls Bridge.[2]

### *The terms of the Compact*

The Compact defines the Bridge Commission's powers and duties.[3] The Commonwealth and New Jersey agreed "there be a single agency for both States empowered to further the transportation interests of these States with respect to that part of the Delaware River north of the stone arch bridge of the Pennsylvania Railroad from Morrisville to Trenton[.]"[4] The Commonwealth and New Jersey defined the Bridge Commission's purposes as including "[t]he acquisition, construction, administration, operation and maintenance of such port and terminal facilities within the district as the commission may deem necessary to advance the interests of the two states[.]"[5]

The Commonwealth and New Jersey granted the Bridge Commission specific powers to effect its purposes including the power "[t]o acquire, construct, rehabilitate, improve, maintain, lease as lessor or as lessee, repair and operate, port and terminal facilities[.]"[6]

In addition to specific powers, the Commonwealth and New Jersey more broadly granted the Bridge Commission the ability:

2

> To exercise all other powers, not inconsistent with the Constitutions of the States of Pennsylvania and New Jersey or of the United States, which may be reasonably necessary or incidental to the effectuation of its authorized purposes or to the exercise of any of the powers granted to the commission by this agreement or any amendment thereof or supplement thereto, except the power to levy taxes or assessments for benefits; and generally to exercise, in connection with its property and affairs and in connection with property under its control, any and all powers which might be exercised by a natural person or a private corporation in connection with similar property and affairs.[7]

The elected representatives' agreement, adopted in the Compact approved by Congress, first grants the Bridge Commission the power to construct, operate, repair and maintain its facilities. They then agreed the Bridge Commission has the right to "exercise all other powers" not inconsistent with the United States Constitution or their states' Constitutions which may be reasonably necessary or incidental to effect the Bridge Commission's authorized purposes of maintaining its facilities as it deems necessary. This grant does not mention, let alone reserve, the police power relating to the Bridge Commission's facilities. The Commonwealth and New Jersey then agreed the Bridge Commission could generally exercise any and all powers which a natural person or private corporation may exercise as to their property.

But the Commonwealth and New Jersey knew of, and specifically reserved, police powers for local municipalities relating to roads surrounding the bridges. The Compact granted the Bridge Commission power to maintain streets and highways necessary to effect its purpose but required the Bridge Commission seek consent from the governing body of the local municipality and be subject to reasonable police regulations established by the local municipality:

> The commission may enter upon, use, occupy, enlarge, construct and improve, any street, road or highway, located within the limits of any municipality, and deemed by the commission to be necessary in connection with the acquisition, construction, improvement, maintenance or operation, of any bridge, owned or operated by the commission, or of any bridge approaches, bridge plazas, or approach highways to any such bridge, subject however to the consent of the governing body of such municipality, and to such reasonable police regulations as may be established by such governing body.[8]

3

## *The Scudder Falls Bridge Project*

The Bridge Commission maintains multiple bridges and roads along a 140-mile span of the Delaware River between the Commonwealth and New Jersey.[9] One of those bridges, the Scudder Falls Bridge, carries Interstate Highway 295 over the Delaware River and connects the two states between Mercer County, New Jersey and Bucks County, Pennsylvania.[10] In 2002, the Bridge Commission began discussing a project to replace the Scudder Falls Bridge which had become "functionally obsolete."[11] The Bridge Commission invested over five hundred million dollars into the Scudder Falls Bridge Project.[12]

As part of the project, the Bridge Commission began constructing new buildings in the Commonwealth near the Scudder Falls Bridge in 2018.[13] The Bridge Commission constructed a Bridge Monitoring Building and is near completing a new Administrative Building, a four-story building in the Commonwealth where its employees will work.[14] Schindler Elevator Corporation installed elevators in the buildings.[15] The new Administrative Building will replace the outdated administrative facility in Morrisville, Pennsylvania.[16]

On November 5, 2018, the Commonwealth warned the Bridge Commission it failed to apply for a building permit for the Administrative Building and must stop work until the Commonwealth issues a permit.[17] On November 30, 2018, the Bridge Commission told the Commonwealth it "is not subject to the regulatory authority of the Commonwealth of Pennsylvania" including the Commonwealth's Uniform Construction Code.[18]

On February 8, 2019, the Commonwealth confirmed its disagreement with the Bridge Commission asserting the Commonwealth "has not surrendered its sovereign police power to protect the safety, health and welfare of its citizens, and that, the Uniform Construction Code mandates plans review and inspections of all building construction projects."[19] The

4

Commonwealth then declined to require a building permit after the Bridge Commission promised it would hire a third-party inspection agency.[20] The Commonwealth conditioned its exception upon the Bridge Commission providing inspection reports for the Administrative Building after construction.[21] We have no basis to find the Commonwealth and Bridge Commission did not effect this compromise.

### *Dispute over the elevator inspection and repair.*

But then the Bridge Commission needed to activate the elevators which leads to today's dispute. On April 8, 2019, the Bridge Commission told Schindler to activate the elevators at the Scudder Falls Project.[22] On May 1, 2019, Schindler asked the Commonwealth if it could activate the elevators.[23] On May 2, 2019, Schindler's District Operations Manager Brandon Miskell told the Bridge Commission the Commonwealth's Department of Labor and Industry inspector Ray Adkins told him not to turn control of the elevators over to the Bridge Commission "due to the ongoing jurisdictional issue regarding whether it is a federal or state project."[24] Schindler placed the elevators out of service the same day.[25] Schindler decided to follow this Commonwealth inspector's advice rather than review federal law.

On May 3, 2019, Bridge Commission employees attempted to put the Bridge Monitoring Building's elevator back in service.[26] The elevator stopped working and Schindler refused to repair the elevator.[27] The elevator remains unrepaired.[28]

The Bridge Commission's Executive Director Joseph Resta swears the lack of working elevators will cause increased storage costs, delays on final completion of the project, and the inability of staff to occupy the buildings.[29] The lack of elevators makes the Administrative Building "partially inaccessible to handicapped persons."[30] The Bridge Commission cannot complete construction of the Administrative Building without a working elevator. For example,

the furniture contractor refuses to install furniture on the upper floors if without a working elevator.[31] The Bridge Commission scheduled furniture installation for July 29, 2019.[32]

Mr. Resta swears the delay in completing the Administrative Building will lead to a "cascade" of delays in beginning other projects.[33] For example, the Bridge Commission will demolish the Morrisville offices and reconstruct the building.[34] It cannot begin this project until it completes the Administrative Building since the Morrisville employees will occupy this new building.[35] Once it finishes the Morrisville project it will construct a maintenance facility in Langhorne, Pennsylvania.[36] Mr. Resta swears delays in finishing the Administrative Building hold up both projects.[37]

On July 9, 2019, the Bridge Commission sued the Secretary of the Commonwealth's Department of Labor and Industry for declaratory and injunctive relief to enjoin the Commonwealth from imposing its regulations on the Bridge Commission.[38] The Bridge Commission alleges the Compact Clause precludes the Commonwealth from unilaterally imposing its elevator inspection laws on the Bridge Commission without the express intent of the Commonwealth's and New Jersey's legislatures.

After filing the lawsuit, the Bridge Commission agreed to indemnify its contractors and subcontractors while it resolved its disputes with the Commonwealth.[39] But on July 17, 2019, Schindler told the Bridge Commission it would not enter an indemnity agreement and again refused to activate or repair the elevators.[40] The elevators in the Administrative Building and the Bridge Monitoring Building remain deactivated.

**II.    Analysis.**

Facing delays in construction and confusion on the jobsite due to Schindler's decision to follow a Commonwealth inspector's direction, the Bridge Commission moves to preliminarily

6

enjoin the Commonwealth's attempt to regulate the elevators in the Administrative Building and the Bridge Monitoring Building. The Bridge Commission argues our Court of Appeals held a state cannot impose its laws on the Bridge Commission under the Compact without the express intent of the Commonwealth's and New Jersey's legislatures. It also argues it suffers irreparable harm because the lack of working elevators causes a "domino effect" of construction delays in the Scudder Falls Project and other future projects.

The Commonwealth argues the Bridge Commission fails to show a likelihood of success on the merits because the Commonwealth in entering the Compact did not cede its police power to regulate entities within its borders—even entities governed by other sovereigns such as a bi-state agency created by a Compact under the Constitution. It argues the Bridge Commission fails to show irreparable harm because it could merely comply with state regulation.

"A preliminary injunction is an extraordinary remedy that should be granted only if a party shows: (1) a substantial likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief."[41] The Bridge Commission bears the burden of proving each of the "first two 'most critical' factors[.]"[42] Only if the Bridge Commission satisfies the first two factors do we consider "the remaining two factors and determine[] in [our] sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief."[43]

## A. The Bridge Commission preliminarily shows a substantial likelihood of success on the merits on the elevator inspections.

The Bridge Commission must show a substantial likelihood of success on the merits of its claims. To establish a likelihood of success, the Bridge Commission must "produce sufficient

7

evidence to satisfy the essential elements of the underlying cause of action."[44] It need only prove a "'prima facie case,' not a 'certainty' [it will] win."[45]

"A showing that is 'significantly better than negligible but not necessarily more likely than not' is sufficient to obtain preliminary injunctive relief."[46] "We do not require that the right to a final decision after trial be 'wholly without doubt'; the movant need only show a 'reasonable probability' of success."[47] To determine whether the Bridge Commission demonstrates a likelihood of success on the merits, we must "examine the legal principles controlling the claim and the potential defenses available to the opposing party."[48]

The Bridge Commission argues it will succeed because our Court of Appeals held under the Compact Clause the Commonwealth and New Jersey must exhibit "express intent" to apply its laws to the Bridge Commission.[49] It argues as a congressionally-approved "bi-state entity"—much like a federal agency—a state cannot unilaterally impose its regulations on the Bridge Commission.

## 1.    The Commonwealth and New Jersey entered a Compact creating the Bridge Commission.

The Compact Clause of the United States Constitution governs the Bridge Commission. The Commonwealth and New Jersey created the Bridge Commission in 1934 as a "bi-state entity" under the Compact Clause of the United States Constitution.[50] The Compact Clause provides "[n]o State shall, without the Consent of Congress . . . enter into any Agreement or Compact with another State[.]"[51] Congress approved the Compact in 1935.[52]

The Commonwealth and New Jersey created the Bridge Commission in 1934 to "operate bridges spanning the Delaware River" between the two states.[53] States may agree under the Compact Clause to form a "bi-state entity" like the Bridge Commission to address "interests and problems that do not coincide nicely . . . with State lines."[54] By creating the Bridge Commission,

8

the Commonwealth and New Jersey "each surrendered a portion of their sovereignty over certain Delaware River bridge operations in order to better serve the regional interest."[55] The Bridge Commission's powers and duties "are framed entirely by the Compact."[56]

## 2. States may not impose its construction codes on federal agency buildings.

The Commonwealth seeks to impose its elevator safety regulations on the Bridge Commission. The Commonwealth's General Assembly granted its Department of Labor and Industry authority to inspect elevators in buildings located in the Commonwealth.[57] Section 405 of the Pennsylvania Code governs elevator inspections.[58] The Department of Labor and Industry requires a property owner "apply to the Department for a permit before the construction, alteration, replacement or repair of an elevator or lifting device."[59] The Department then grants or denies the permit within thirty days of the application.[60]

The Bridge Commission argues because Congress approved its Compact, we treat it like a federal agency. States cannot impose safety and inspection regulations on federal buildings or property. Congress instead provides federal agencies must comply with federal building codes. When constructing buildings, Congress mandates federal agencies comply with "nationally recognized model building codes and with other applicable nationally recognized codes, including electrical codes, fire and life safety codes, and plumbing codes, as the Administrator decides is appropriate."[61] Congress requires federal agencies consult with the state where the building is located.[62] While federal agencies must give state officials' recommendations "due consideration," the agencies need not implement recommendations.[63]

We agree the Bridge Commission resembles a federal agency. Congress approved the Compact. The Bridge Commission is governed by the Compact and is analogous to a federal agency. In other words, governed by another sovereign.

9

### 3. The Commonwealth fails to show we can read a reservation of police powers into the Compact allowing it to impede progress on the Bridge Commission's elevators.

Faced with the Compact's governing language, the Commonwealth must then argue the Compact allows it to exercise a police power to interfere with elevator operations in the Bridge Commission's buildings. The Commonwealth argues the terms of the Compact allow it to regulate the Bridge Commission's elevators. It argues because our Court of Appeals held "[i]nterstate compacts are construed as contracts under the principles of contract law,"[64] we look at the Compact's terms to determine the scope of the Bridge Commission's powers. The Commonwealth argues under the Compact, the two states only grant the Bridge Commission "powers which might be exercised by a natural person or a private corporation in connection with similar property and affairs," and a natural person or corporation cannot self-regulate.[65]

But the Commonwealth only provides part of the the Compact. The Compact first provides the Bridge Commission with the power "[t]o acquire, construct, rehabilitate, improve, maintain, lease as lessor or as lessee, repair and operate, port and terminal facilities[.]"[66]

The Compact then later provides, in full:

> To exercise all other powers, not inconsistent with the Constitutions of the States of Pennsylvania and New Jersey or of the United States, which may be reasonably necessary or incidental to the effectuation of its authorized purposes or to the exercise of any of the powers granted to the commission by this agreement or any amendment thereof or supplement thereto, except the power to levy taxes or assessments for benefits; **and** generally to exercise, in connection with its property and affairs and in connection with property under its control, any and all powers which might be exercised by a natural person or a private corporation in connection with similar property and affairs.[67]

The Commonwealth ignores the specific grant of power to construct, maintain, repair, and operate its terminal facilities. It then ignores the first part of the later provision granting the Bridge Commission "all other powers, not inconsistent with the Constitutions of the States of

10

Pennsylvania and New Jersey or of the United States, which may be reasonably necessary or incidental to the effectuation of its authorized purposes[.]"[68]One authorized purpose in the Compact is "[t]he acquisition, construction, administration, operation and maintenance of such port and terminal facilities within the district as the commission may deem necessary to advance the interests of the two States[.]"[69] The Commonwealth and New Jersey also granted the Bridge Commission specific power "[t]o acquire, construct, rehabilitate, improve, maintain, lease as lessor or as lessee, repair and operate" its facilities.[70] Thus, the power to inspect and regulate its elevators effects the Bridge Commission's purposes to maintain its facilities, including the Administrative Building and Bridge Monitoring Building at the Scudder Falls Project. The Commonwealth's argument the two states did not grant the Bridge Commission power to regulate elevators at the Scudder Falls Project fails.

The Commonwealth argues the second clause granting powers exercised "by a natural person or a private corporation" limits the first clause. Even assuming we looked beyond the specific grant of power to construct, operate, repair, and maintain its facilities and were left only with the later grant of power, the word "and" connects these clauses in the later grant. The Commonwealth and New Jersey did not restrict the Bridge Commission's powers to those powers "which might be exercised by a natural person or a private corporation in connection" with its property.

The Commonwealth argued at our hearing although the two states granted the Bridge Commission power, it did not cede its police power to regulate the Bridge Commission's elevators. But the Commonwealth improperly reads in a limitation the Bridge Commission may exercise powers "not inconsistent" with the Commonwealth's police powers.

11

The Commonwealth's argument fails. This language does not exist in the Compact. As our Court of Appeals cautioned in interpreting the Compact, we "may not read into [the Compact] language or intent that is simply not there."[71] The Commonwealth and New Jersey granted the Bridge Commission "all other powers, not inconsistent with the Constitutions of the States of Pennsylvania and New Jersey or of the United States[.]"[72] The Supreme Court instructed when interpreting a contract, language in the contract "presumably takes its ordinary meaning[.]"[73] The Supreme Court employs the same rules when interpreting statutory language.[74] The ordinary meaning of "all other powers" does not provide a limitation retaining the Commonwealth's police power.

Another provision in the Compact undermines the Commonwealth's argument. The Commonwealth and New Jersey granted the Bridge Commission power to:

> enter upon, use, occupy, enlarge, construct and improve, any street, road or highway, located within the limits of any municipality, and deemed by the commission to be necessary in connection with the acquisition, construction, improvement, maintenance or operation, of any bridge, owned or operated by the commission, or of any bridge approaches, bridge plazas, or approach highways to any such bridge, subject however to the consent of the governing body of such municipality, and to such reasonable police regulations as may be established by such governing body.[75]

The Compact is not ambiguous. The Commonwealth and New Jersey agreed its local municipalities retained police power to regulate the streets, roads, highways, bridge approaches, bridge plazas, and approach highways despite granting the Bridge Commission power to alter these thoroughfares to effect its purposes. The Commonwealth and New Jersey understood how to reserve police power and did it expressly by reserving police power relating to streets and roads. The Commonwealth cannot credibly argue the two states knew how to reserve police power in one section of the Compact but failed to do so in another section.[76]

### 4. We do not look at course of performance because the Commonwealth fails to show the Compact contains ambiguous terms.

The Commonwealth argues the Bridge Commission acquiesced to the Commonwealth's regulations, showing a "course of performance" which would define the terms in the Compact when interpreted as a contract. We treat compacts "as contracts under the principles of contract law."[77] We first look at "the express terms of the Compact as the best indication of the intent of the parties[.]"[78] If the terms are ambiguous, we may look at extrinsic evidence including "the parties' course of performance under the Compact[.]"[79]

But we can only look at extrinsic evidence if the terms of the Compact are ambiguous. The Commonwealth fails to identify ambiguous language in the Compact. We independently find no ambiguous language. "All other powers" takes its ordinary meaning: all powers, including any police power the Commonwealth unsuccessfully claims it retained.

The Commonwealth fails to show it retained police power to regulate the Bridge Commission's elevators. We decline to add language not agreed by the elected officials of the Commonwealth and New Jersey.

### 5. We agree with courts rejecting attempts to impose state law on bi-state entities created under the Compact Clause.

#### a. Our Court of Appeals rejected an attempt to impose New Jersey's labor laws on the Bridge Commission.

As the Commonwealth and New Jersey did not in its Compact retain police power to regulate the Bridge Commission, the Bridge Commission argues neither state can impose its regulations on the Bridge Commission without "express consent" of both states' legislatures.[80] In *Operating Engineers*, an engineers' union sued the Bridge Commission in federal court for injunctive relief compelling the Bridge Commission comply with New Jersey collective bargaining laws.[81] The District Court for the District of New Jersey granted the Bridge Commission summary

13

judgment holding the states' legislatures did not express "a clear intent to impose their labor laws upon the Commission."[82]

Our Court of Appeals held it would not impose state collective bargaining laws on the Bridge Commission absent both states' "express intent to amend the Compact or apply their collective bargaining laws to the Commission's employees."[83] The court explained the Compact did not address Bridge Commission employees' right to collectively bargain. The union argued because the Commonwealth and New Jersey passed similar labor laws allowing collective bargaining, the states intended amendment to the Compact applying these laws.

The Court of Appeals explained no language in the Compact permitted the Commonwealth and New Jersey to amend the Compact by enacting similar legislation. The court also found no language in the Compact allowing one state to modify the Compact by passing legislation "concurred in" by the other state.[84] The court refused to adopt the union's argument the states passing similar legislation showed intent to imply the legislation to the Bridge Commission.[85] Neither the Compact nor the Commonwealth's and New Jersey's labor laws contained "express legislative intent" to apply the labor laws to the Bridge Commission.[86] The Court of Appeals further cautioned against implying intent to apply state law since a "bi-state entity" like the Bridge Commission "[is] not subject to the unilateral control of any one of the States that compose the federal system."[87] Without express "legislative intent" of both states to impose New Jersey's labor laws on the Bridge Commission, our Court of Appeals affirmed the district court's grant of summary judgment to the Bridge Commission.[88]

### b. The New Jersey Supreme Court rejected an attempt to impose New Jersey building code regulations on a bi-state entity.

Recognizing *Operating Engineers* involved state labor statutes, the Bridge Commission argues the Compact Clause also bars application of state regulations concerning construction

14

codes.[89] In *Eastern Paralyzed Veterans Ass'n, Inc. v. City of Camden*, the Delaware River Port Authority, a bi-state entity created by compact, and the Camden Housing Authority planned to construct a transit terminal to operate a regional train service crossing the Delaware River between the Commonwealth and New Jersey.[90] A veterans association sued arguing the Port Authority must submit to the New Jersey Uniform Construction Code requiring it install an elevator in the terminal for handicapped persons.[91] The New Jersey trial court granted summary judgment for the veterans association holding the Port Authority must submit to New Jersey's Construction Code. The appellate court affirmed.

The New Jersey Supreme Court reversed explaining the Commonwealth and New Jersey created the Port Authority under Compact as a "bi-state entity" meaning neither state "can unilaterally impose additional duties, powers or responsibilities upon the Authority."[92] Neither the Commonwealth nor New Jersey could impose regulations on the Port Authority unless both states expressly agreed.[93] While the New Jersey legislature provided its Construction Code applied to bi-state entities, the court held it would not impose the Construction Code without a similar express statement of intent from the Pennsylvania General Assembly.[94]

The Bridge Commission shows a substantial likelihood of success on its claims. Our Court of Appeals explained the Commonwealth and New Jersey cannot impose state law on the Bridge Commission without "express intent" of both states' legislatures to bind the Bridge Commission.[95] We find no express statement of intent from the states' legislatures to impose the Commonwealth's elevator safety regulations on the Bridge Commission. Even assuming the Commonwealth could adduce an express statement of intent from its General Assembly, the nature of the Commission as a "bi-state entity" means the Commonwealth cannot "unilaterally impose additional duties,

15

powers or responsibilities upon" the Bridge Commission.[96] The Bridge Commission shows a substantial likelihood of success on the merits of its claims.

In its motion for a preliminary injunction, the Bridge Commission describes the Commonwealth's attempts to regulate the Bridge Commission's elevators in its Administrative Building and Bridge Monitoring Building.[97] It does not address the Commonwealth's attempts to regulate other parts of the Scudder Falls Project. Thus, we limit injunctive relief to the Commonwealth's attempts to regulate or interfere with the operation of the Bridge Commission's elevators in the Administrative Building and the Bridge Monitoring Building.

## B.    The Bridge Commission shows irreparable harm.

The Bridge Commission must show "it will suffer irreparable harm if the injunction is denied." "A plaintiff has the burden of proving a 'clear showing of immediate irreparable injury.'"[98] Further, "[t]he 'requisite feared injury or harm must be irreparable—not merely serious or substantial,' and it 'must be of a peculiar nature, so that compensation in money cannot atone for it.'"[99]

The Bridge Commission argues delays in a construction project causing a "domino effect" of further delays constitute irreparable harm.[100] In *Transcontinental*, a gas company sued to condemn landowners' property for construction of a gas pipeline in Pennsylvania.[101] Several landowners objected to the pipeline's construction. The company moved for a preliminary injunction for immediate possession of the landowners' property. The company argued the delays in construction constituted irreparable harm.[102]

The district court agreed with the company.[103] Company representatives testified "every delay" in the construction process has a "domino effect" delaying the project further.[104] The company adduced evidence of contracts to provide gas by a certain date. Representatives also

16

testified the company needed possession of the property to complete surveys before beginning construction. The company could only perform environmental surveys at a particular time of the year and further delay push back environmental surveys to the following year. They also testified the company would lose $500,000 per month, and delay revenue of $33,000,000 per month if the court did not order injunctive relief. The court explained "untimeliness" causes irreparable harm in pipeline construction projects:

> The magnitude of the Project requires a complex and coordinated construction process, with work activities being performed in sequential phases. Each piece of the construction puzzle depends on the prior piece timely placed. Untimeliness in one small part of this enormous project would result in a domino effect on the timeliness of all other areas of the project.[105]

Like the company in *Transcontinental*, the Bridge Commission shows irreparable harm. Schindler will not activate the Bridge Commission's elevator in the Administrative Building. The Bridge Commission argues without its elevator, it cannot finish construction on the Administrative Building. Without the Administrative Building, it cannot demolish and reconstruct the Morrisville office, which affects the commencement of the Langhorne building.[106] The Bridge Commission shows Schindler's refusal to activate the elevators causes a "domino effect" on the timeliness of other projects.

The Commonwealth argues the Bridge Commission fails to show irreparable harm because it can occupy its current administrative building in Morrisville.[107] But the Commonwealth ignores the fact without a working elevator, the Bridge Commission cannot complete construction of the new Administrative Building, causing a "domino effect" delaying further Bridge Commission projects.

The Commonwealth also argues the Bridge Commission seeks "Schindler Elevator, a third party to this litigation, be compelled to place the Commission's elevators in service."[108] It argues

17

it approved Schindler to install the elevator, but the Bridge Commission creates its own harm "in refusing to allow the [the Commonwealth] to inspect the elevator[.]"[109] But the Bridge Commission seeks an order "enjoining [the Commonwealth]'s enforcement of state-based laws and regulations against the Commission."[110] We do not enjoin Schindler's conduct in granting injunctive relief. The Bridge Commission alleges Schindler refuses to activate the elevators under the Commonwealth's order. By enjoining the Commonwealth from interfering with the Bridge Commission's elevator operations, the Commonwealth no longer has a basis for binding Schindler's conduct. The Commonwealth's arguments fail.

The Bridge Commission shows irreparable harm necessary for preliminary injunctive relief.

## C.     Preliminary injunctive relief will not result in greater harm to the Department.

We also examine whether "granting preliminary relief will not result in even greater harm to" the Commonwealth. The Bridge Commission argues the Commonwealth has no interest in unconstitutionally applying its regulations. We agree. In *Chamber of Commerce of U.S. v. Edmondson*, Oklahoma passed a law regulating employment of illegal immigrants.[111] Several chambers of commerce sued Oklahoma to enjoin enforcement arguing federal law preempts the Oklahoma immigration law.[112] The Court of Appeals found Oklahoma would suffer no harm with an injunction explaining a state "does not have an interest in enforcing a law that is likely constitutionally infirm."[113]

The Bridge Commission argues the Commonwealth has no interest in enforcing its regulations against the Bridge Commission in violation of federal law and the Constitution.[114] If the Commonwealth's and New Jersey's legislatures did not expressly allow the Commonwealth to impose its regulations on the Bridge Commission, the Commonwealth's actions violate the

constitutional doctrine "bistate entities . . . are not subject to the unilateral control of any one of the States that compose the federal system."[115] We agree with the Bridge Commission. The Commonwealth fails to show both states' express intent to bind the Bridge Commission to the Commonwealth's elevator safety regulations. The Commonwealth suffers no harm from its inability to impose its elevator safety regulations in violation of the Constitution.

### D. The public interest favors injunctive relief.

The Bridge Commission must show "the public interest favors" a preliminary injunction. "As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff."[116] The Bridge Commission argues the public interest favors a preliminary injunction as both the Commonwealth and New Jersey agreed in the Compact "[i]t is highly desirable that there be a single agency for both States empowered to further the transportation interests of these States with respect to that part of the Delaware River[.]"[117] We agree. The Commonwealth did not retain police power to regulate the Bridge Commission. Without an express statement of legislative intent from both states' legislatures, the Commonwealth and New Jersey intended the Bridge Commission act as the sole agency to construct, operate, and maintain bridges over the Delaware River. The public interest supports upholding the two states' agreement.

### III. Conclusion.

In an accompanying Order, we grant the Bridge Commission's Motion for a preliminary injunction.

---

[1] ECF Doc. No. 10-2 ¶ 3.

[2] *Id.* at ¶ 4.

19

[3] 36 Pa. Stat. Ann. § 3401; N.J. Stat. Ann. § 32:8-1. Both Pennsylvania and New Jersey codified the Compact in their statutory codes. For ease of reference, we cite to Pennsylvania's statute.

[4] *Id.* § 3401, Preamble.

[5] *Id.* § 3401, Art. I(f).

[6] *Id.* § 3401, Art. II(q).

[7] *Id.* § 3401, Art. II(p).

[8] *Id.* § 3401, Art. X(d).

[9] ECF Doc. No. 10-2 ¶ 4.

[10] *Id.* at ¶ 6.

[11] *Id.* at ¶ 11.

[12] *Id.* at ¶ 6.

[13] *Id.*

[14] *Id.* at ¶ 7.

[15] *Id.* at ¶ 9.

[16] *Id.* at ¶ 7.

[17] ECF Doc. No. 12-2 ¶¶ 9-10.

[18] *Id.* at ¶ 11.

[19] *Id.* at ¶ 13.

[20] *Id.* at ¶ 14.

[21] *Id.* at ¶ 15.

[22] *Id.* at ¶ 25.

[23] *Id.* at ¶ 26.

[24] ECF Doc. No. 14-1 ¶¶ 5-6.

[25] *Id.* at ¶ 9.

[26] ECF Doc. No. 12-2 ¶ 28.

[27] ECF Doc. No. 14-1 ¶¶ 10-11.

[28] *Id.* at ¶ 11.

[29] ECF Doc. No. 10-2 ¶ 15.

[30] *Id.* at ¶ 12.

[31] *Id.* at ¶ 14.

[32] *Id.* at ¶ 14.

[33] *Id.* at ¶ 16.

[34] *Id.* at ¶ 17.

[35] *Id.*

[36] *Id.* at ¶ 18.

[37] *Id.* at ¶ 20.

[38] ECF Doc. No. 1.

[39] ECF Doc. No. 10-2 ¶ 21.

[40] *Id.* at ¶ 22.

[41] *Youtie v. Macy's Retail Holding, Inc.*, 653 F. Supp. 2d 612, 627 (E.D. Pa. 2009); *see A.N. By & Through Niziolek v. Upper Perkiomen Sch. Dist.*, 228 F. Supp. 3d 391, 396 (E.D. Pa. 2017).

[42] *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), *as amended* (June 26, 2017).

[43] *Id.*

[44] *Borough v. Middletown Water Joint Venture LLC*, No. 18-861, 2018 WL 3473972, at *5 (M.D. Pa. July 19, 2018) (citing *Punnett v. Carter*, 621 F.2d 578, 582-83 (3d Cir. 1980)).

[45] *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017) (quoting *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001)).

[46] *Middletown Water Joint Venture LLC*, 2018 WL 3473972, at *5 (quoting *Reilly*, 858 F.3d at 179).

[47] *Issa*, 847 F.3d at 131 (quoting *Punnett*, 621 F.2d at 583).

[48] *Middletown Water Joint Venture LLC*, 2018 WL 3473972, at *5.

[49] *Int'l Union of Operating Eng'rs, Local 542 v. De. River Joint Toll Bridge Comm'n*, 311 F.3d 273, 280 (3d Cir. 2002).

[50] ECF Doc. No. 10-2 ¶ 3.

[51] U.S. Const. art. I, § 10, cl. 3.

[52] *Operating Eng'rs*, 311 F.3d at 274.

[53] *Id.* (citing 36 Pa. Stat. Ann. § 3401; N.J. Stat. Ann. § 32:8-1).

[54] *Id.* at 275 (quoting *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 40 (1994)).

[55] *Id.* at 276.

[56] *Id.* at 274.

[57] 35 Pa. Stat. Ann. § 7210.105(c).

[58] 34 Pa. Code § 405.1.

[59] *Id.* § 405.3(a).

[60] *Id.* § 405.3(e).

[61] 40 U.S.C. § 3312(b).

[62] *Id.* § 3312(d)(1)(A).

[63] *Id.* § 3312(e).

[64] *Wayne Land & Mineral Grp. LLC v. De. River Basin Comm'n*, 894 F.3d 509, 527 (3d Cir. 2018) (quoting *Tarrant Reg'l Water Dist. v. Herrmann*, 569 U.S. 614, 628 (2013)).

[65] 36 Pa. Stat. Ann. § 3401, Art. II(p).

[66] *Id.* § 3401, Art. II(q).

[67] *Id.*

[68] *Id.*

[69] *Id.* § 3401, Art. I(f).

[70] *Id.* § 3401, Art. II(q).

[71] *Operating Eng'rs*, 311 F.3d at 280.

[72] *Id.* § 3401, Art. II(p).

[73] *DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 469 (2015).

[74] *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010) "[W]e begin by analyzing the statutory language, 'assum[ing] that the ordinary meaning of that language accurately expresses the legislative purpose.'").

[75] 36 Pa. Stat. Ann. § 3401, Art. X(d).

[76] *See In re New Valley Corp.*, 89 F.3d 143, 149 (3d Cir. 1996) ("A court cannot interpret words in a vacuum, but rather must carefully consider the parties' context and the other provisions in the plan."); *see, e.g.*, *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 497 (1992) (explaining Congress's use in one section of a statute of the term "employee" and the term "person entitled to compensation" which courts had interpreted more narrowly shows "Congress intended the two terms to have different meanings").

[77] *Wayne Land*, 894 F.3d at 527 (quoting *Herrmann*, 569 U.S. at 628).

[78] *Id.* (quoting *Herrmann*, 569 U.S. at 628).

[79] *Id.*

[80] *Operating Eng'rs*, 311 F.3d at 274.

[81] *Id.* at 275.

[82] *Id.* at 274.

[83] *Id.* at 280.

[84] *Id.*

[85] *Id.*

[86] *Id.* at 281.

[87] *Id.* (quoting *Hess*, 513 U.S. at 42).

[88] *Id.* at 276.

[89] ECF Doc. No. 10-1, at p. 5.

[90] 545 A.2d 127, 128 (N.J. 1988).

[91] *Paralyzed Veterans*, 545 A.2d at 130.

[92] *Id.* (quoting *Nardi v. Delaware River Port Auth.*, 490 A.2d 949, 950 (Pa. Cmmw. Ct. 1985)).

[93] *Id.* at 132.

[94] *Id.* at 134.

[95] *Operating Eng'rs*, 311 F.3d at 280.

[96] *Paralyzed Veterans*, 545 A.2d at 130 (quoting *Nardi*, 490 A.2d at 950).

[97] ECF Doc. No. 10-1, at pp. 3-4.

[98] *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (quoting *Continental Group, Inc. v. Amoco Chemicals Corp.,* 614 F.2d 351, 359 (3d Cir.1980)).

[99] *Id.* (quoting *Glasco v. Hills,* 558 F.2d 179, 181 (3d Cir.1977)).

[100] *Transcon. Gas Pipe Line Co., LLC v. Permanent Easement for 2.14 Acres*, No. 17-1725, 2017 WL 3624250, at *1 (E.D. Pa. Aug. 23, 2017).

[101] *Id.*

[102] *Id.* at *8.

[103] *Id.*

[104] *Id.*

[105] *Id.* at *8-9.

[106] ECF Doc. No. 10-2 ¶¶ 17-18.

[107] ECF Doc. No. 12, at p. 17.

[108] *Id.* at p. 18.

[109] *Id.*

[110] ECF Doc. No. 10 ¶ 1.

[111] *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 750 (10th Cir. 2010).

[112] *Id.*

[113] *Id.* at 771.

[114] ECF Doc. No. 10-1, at p. 9.

[115] *Hess*, 513 U.S. at 42.

[116] *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994).

[117] 36 Pa. Stat. Ann. § 3401; N.J. Stat. Ann. § 32:8-1.