# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DELAWARE RIVER JOINT TOLL** | : | **CIVIL ACTION** |
| **BRIDGE COMMISSION** | : | |
| | : | |
| **v.** | : | **NO. 19-2978** |
| | : | |
| **W. GERALD OLEKSIAK** | : | |

# <u>MEMORANDUM</u>

**KEARNEY, J.**                                                            **March 26, 2020**

Faced with balancing competing interests of thirteen sovereign states in forming a national government, our Framers negotiated and the states ratified the Compact Clause to the Constitution. The Compact Clause authorized the sovereign states to reach agreements, or "compacts," for their common welfare such as setting boundaries or forming independent bi-state entities governed by the compact terms to manage common interests. A compact creating bi-state entities requires the states' elected representatives agreeing to surrender certain of their citizens' sovereign authority to this bi-state entity to further their common welfare. The compact terms are not federal law until approved by Congress. Over 230 years later, we today affirm the meaning of the Compact Clause applied to a 1934 Compact approved by Congress in 1935 after being negotiated by Pennsylvania's and New Jersey's elected representatives forming and defining the powers of a bi-state commission to manage several bridge properties between the states north of Philadelphia. The elected representatives agreed, and have not changed their mind since, to grant the bi-state commission the power to operate, improve, and maintain its property including the structures relating to the bridges.

In 2019, Pennsylvania asserted the bi-state commission must pass its elevator inspections and comply with its fuel storage law compliant with Pennsylvania's sovereign police power to

ensure the safety of her citizens as to a new administration building for one of the bridges. The bi-state commission disagreed. Both now move for summary judgment representing there is no question of material fact. They each ask we declare their rights under the compact relating to the elevator inspections and fuel storage at a newly constructed administration building complex for the Scudder Falls Bridge over the Delaware River connecting Bucks County, Pennsylvania and Mercer County, New Jersey.

We interpret the compact to unambiguously grant the bi-state commission the authority to operate and maintain its real property. Pennsylvania fails to identify compact language where the elected representatives retained sovereign police power over the bi-state commission's building improvements and maintenance, or language where Pennsylvania's retention may be found ambiguous and we could examine the parties' course of dealing.

Pennsylvania agreed to create a bi-state commission free from its unilateral control unless both states agreed to regulate certain aspects of the ongoing activities of the bi-state commission. They did not agree to do so as to elevator inspections or fuel storage regulations; they instead surrendered each state's sovereign power to compel the bi-state commission to subject its buildings to one state's inspection and building operation regulations. In today's Order, we declare Pennsylvania may not impose its elevator inspection and fuel storage regulations upon the administration building complex for the Scudder Falls Bridge owned by the bi-state commission.

## I. Undisputed facts[1]

The Delaware River forms the entire border between the Commonwealth of Pennsylvania and the State of New Jersey. The two states share a natural interest in safe and reliable river crossings to facilitate national and regional trade and transportation. During the 1800s, the states assigned bridge building and maintenance responsibilities to private companies.[2] These

companies charged tolls to bridge travelers to finance bridge operations while profiting the excess.[3] In the 1910s, the states—motivated by the public's increased use of cars—changed course and formed the Joint Commission for Elimination of Toll Bridges to acquire bridges for joint state ownership.[4] The states granted this Joint Commission the power to use eminent domain to acquire the land necessary to manage the bridges.[5] By the mid-1930s, the Joint Commission had successfully purchased sixteen bridges from private owners.[6]

### *The states form the Commission governed by Compact.*

Over eighty-six years ago, the states then agreed to create the Delaware River Joint Toll Bridge Commission to jointly own and operate their purchased bridges.[7] The states carried forward powers they granted to the earlier Joint Commission to the new Commission, including the power to acquire new bridges and use eminent domain.[8] The elected representatives of both states passed laws surrendering certain of their sovereign powers first recognized by our Framers in the Tenth Amendment to the new Commission through an interstate compact.[9] Congress approved the states' compact in 1935.[10] The Commission has continually owned, constructed, operated, and maintained bridges between the two states under the Compact since then.[11] The Commission today controls seven toll bridges and thirteen toll-supported bridges along the northern 140 miles of the states' shared border.[12]

### *The Commission's long-planned Scudder Falls Bridge project.*

One of the Commission's toll bridges is the Scudder Falls Bridge carrying Interstate 295 over the Delaware River connecting Lower Makefield Township in Bucks County, Pennsylvania with Ewing Township in Mercer County, New Jersey.[13] In 2002, the Commission began discussing a project to replace the Scudder Falls Bridge.[14] Fifteen years later in 2017, the Commission began a four-and-a-half-year project to replace the Scudder Falls Bridge.[15]

As a part of the project, the Commission purchased a ten-acre parcel of land in Pennsylvania near the Scudder Falls Bridge to construct a new administration building to consolidate its executive and administrative staff at a single location.[16]  The Commission purchased the parcel from Lower Makefield Township, Pennsylvania in 2016.[17]  The Commission began constructing the facility the next year.[18]  The Commission hired a contractor and various subcontractors to finish the project.[19]

*Pennsylvania demands compliance with its regulations leading to this lawsuit.*

After years of planning and after the Commission purchased and began construction on its property, the Commission's project caught the eye of Pennsylvania's Department of Labor & Industry, an agency charged with enforcing the Commonwealth's Uniform Construction Code.[20]  In November 2018, two Department inspectors drove past the Scudder Falls administration building construction site and "observed that building construction had begun, despite the [Commission's] failure to apply for a building permit" as required under Department regulations.[21]  The two inspectors notified the Department's Uniform Construction Code Field Operations Manager Jeffrey Criss.[22]  Manager Criss advised the Commission he intended to send a building inspector to the administration building to issue a stop work order under the Department regulations because the Commission did not have a valid building permit.[23]  On November 30, 2018, the Commission responded by stating it "is not subject to the regulatory authority of the Commonwealth of Pennsylvania" including the Department's Uniform Construction Code.[24]

On February 8, 2019, the Department's Secretary, W. Gerard Oleksiak, confirmed his disagreement with the Commission asserting the Department "does not concur with the [Commission's] position" about not being subject to the Uniform Construction Code.[25]  The Secretary explained the Department "has not surrendered its sovereignty, especially as it extends

to its sovereign police power to protect the safety, health and welfare of its citizens."[26]   The Secretary stated: "[t]o carry out that police power and to protect life, health, property and environment and to ensure the safety and welfare of the general public and the owners, occupants and users of buildings and structures, the [Uniform Construction Code] mandates plans review and inspections of all building construction projects."[27]   The Secretary offered to excuse the Commission from obtaining a building permit "on this occasion only" if the Commission agreed to submit to the Department's regulations in other areas, including allowing the Department to "enforce the [Uniform Construction Code] with regard to the elevators in the administration building at Scudder Falls Bridge, and the Combustible and Flammable Liquids Act with regard to any fuel-pumping station that may be constructed."[28]

The Commission did not agree with the Secretary.  It pushed forward with its long-planned administration building.  The Secretary began threatening to regulate Commission's elevator subcontractor.  Facing this involvement, the Commission sued the Secretary seeking declaratory relief as to the parties' rights under the Compact and to enjoin him from imposing the Commonwealth's building regulations on the Commission.[29]   We enjoined the Secretary from enforcing the elevator inspection.[30]   The Secretary defended his earlier position and counterclaimed for declaratory judgment arguing the Department may unilaterally regulate the Commission's buildings.[31]   The Commission completed construction with its elevators in place. The parties do not have present dispute with either the elevator inspection or fuel-pumping regulations.  At oral argument both parties represented these are recurring as periodic licensing and inspection.

New Jersey did not take a position before us.

## II.    Analysis[32]

After extensive discovery and agreeing there are no genuine issues of material fact, the Commission and Secretary Oleksiak cross move for a declaratory judgment: the Commission argues the Compact precludes the Secretary from unilaterally imposing the Commonwealth's elevator and fuel-pumping inspection regulations on the Commission without the express intent of Pennsylvania's and New Jersey's legislatures manifest in the Compact; and, the Secretary argues the Commonwealth retains its sovereign police power both through the Compact and otherwise to enforce regulations at the Commission's buildings in Pennsylvania to ensure the safety of Pennsylvania citizens.

Whether the Secretary may unilaterally regulate the Commission's maintenance and operation of its buildings is a question of the rights and powers Pennsylvania and New Jersey surrendered to the Commission in their negotiated Compact. While the Framers recognized each state's sovereignty over matters not given to the national government such as local laws, property rights, and local law enforcement, the Framers also granted each state the right to enter into compacts agreeing to surrender their reserved sovereign power to a third interstate agency not controlled by the states but approved in the national interest by Congress. These interstate agencies generally are not subject to one state's unilateral control or to state regulation unless the compacting states expressly agree.

States effect the purposes and powers of interstate agencies through a negotiated agreement known as a compact. The Compact before us negotiated by Pennsylvania and New Jersey is largely the same agreement Congress approved in 1935.[33]   The states and Congress approved additional jurisdiction and financing powers to the Commission in 1947, 1952, and 1987.[34]  But

the states' agreement to expand the Commission's jurisdiction to "port and terminal facilities" in 1953 "failed to gain full congressional approval[.]"[35]

We may only consider the terms of the Compact approved by Congress.[36]  Through the congressionally approved Compact, the states create the Commission as "a body corporate and politic" and "the public instrumentality" of the two states.[37]  Pennsylvania and New Jersey define the Commission's purposes as including "administration, operation, and maintenance of the joint State-owned bridges" and "preparation of plans and specifications for, and location, construction, administration, operation and maintenance of, such additional bridge communications over the Delaware River[.]"[38]  The states agreed the Commission "shall be deemed to be exercising an essential government function[.]"[39]

We start with the powers the two states agreed to give to the Commission "[f]or the effectuation of its authorized purposes."[40]  Among these powers include the authority:

- "To sue and be sued."[41]

- "To enter into contracts."[42]

- "To acquire, own, use, lease, operate, and dispose of real property and interest in real property, and to make improvements thereon."[43]

- "To exercise the power of eminent domain."[44]

- "To determine the exact location, system, and character of, and all other matters in connection with, any and all improvements or facilities which it may be authorized to own, construct, establish, effectuate, maintain, operate or control."[45]

In addition to these specific powers, the elected representatives of Pennsylvania and New Jersey agreed to more broadly grant the Commission the ability:

To exercise all other powers, not inconsistent with the Constitutions of the States of Pennsylvania and New Jersey or of the United States, which may be reasonably necessary or incidental to the effectuation of its authorized purposes or to the exercise of any of the foregoing powers, except the power to levy taxes or assessments for benefits; and generally to exercise, in connection with its property

and affairs and in connection with property under its control, any and all powers which might be exercised by a natural person or a private corporation in connection with similar property and affairs.[46]

The states further agreed: "[t]he effectuation of [the Commission's] authorized purposes . . . is and will be in all respects for the benefit of the people of the Commonwealth of Pennsylvania and the State of New Jersey, and for the increase of their commerce."[47]   The states agreed the Commission could exercise all powers reasonably necessary to effect its stated purposes and authorized powers including acquiring, operating and improving their real property and to determine the character of improvements or facilities which it may be authorized to maintain, operate or control.

While the states retained sovereign police power over the Commission's delegated power of eminent domain and power to maintain streets and highways, the Commonwealth and New Jersey did not retain interests in the Commission acquiring, operating and improving real property. Three specific examples highlight the states' reserving powers they arguably surrendered. Pennsylvania and New Jersey first agreed the Commission could exercise the powers of eminent domain.   But then, unlike when they addressed improvement and maintenance of the Commission's facilities, the states specifically required the Commission exercise eminent domain powers in Pennsylvania consistent with the Pennsylvania law creating the earlier Joint Commission for the Elimination of Toll Bridges, and to exercise eminent domain powers in New Jersey consistent with the New Jersey law creating the earlier Joint Commission.[48]   In a like manner, the states, while granting the Commission power to maintain streets and highways necessary to effect its purpose, require the Commission seek consent from the governing body of the local municipality and be subject to reasonable police regulations established by the local municipality.[49]   The states also reserved the power to levy taxes and to "assess[] for benefits."[50]

The states did not carve out a similar retained interest for the states in the surrendered power of improving and maintaining the Commission's property.

The immediate issue before us focuses on whether the Commission must submit to the Department's elevator inspection and Combustible and Flammable Liquid laws at the Scudder Falls administration building.[51] We apply a four-step analysis. First, we determine whether there is a ripe need for declaratory relief. Second, we inspect the background law on the nature of interstate agreements under the Compact Clause to understand whether there is an overarching sovereign power preempting language in the Compact. Third, we interpret the plain language chosen by the states in the Compact, i.e., did the states reserve their rights to inspect and approve improvements to the Commission's property. And, fourth, if we find the Compact's language is ambiguous, we must look to other tools to aid our interpretation, such as whether the Secretary imposed building safety regulations against the Commission in the past without objection or with court approval.

After confirming our jurisdiction and reviewing the background law governing compacts, we find the elected representatives of Pennsylvania and New Jersey unambiguously did not reserve Pennsylvania's or New Jersey's sovereign police power to regulate the Commission. They unambiguously surrendered "any and all powers" to the Commission to make improvements to its buildings other than those they reserved (eminent domain, local police, and taxes). Because the compacting states surrendered specific power to the Commission to improve and maintain its buildings when they otherwise excepted other specific powers, we cannot find the Commission is subject to a silent overriding sovereign police power allowing one of the two compacting states to interfere with the Commission's improvement and maintenance of its property. The elected representatives have not, to date, reserved or limited this authority given to the Commission. We

are not stretching or extending the states' chosen language. We are enforcing the language of the Compact as negotiated by the representatives of the sovereign states and approved by Congress as in the national interest. Consistent with the Compact's unambiguous language, we grant summary judgment for the Commission and enter a declaratory judgment in its favor relating to the construction, improvement, and maintenance of the Scudder Falls administration building as it affects elevator inspections and fuel storage regulations.

### A. The parties' requests for declaratory relief are ripe.

The Commission and the Secretary agree we have federal subject matter jurisdiction over the requests for declaratory relief presently before us. The parties also agree their claims are ripe for our review even though the parties have progressed in completing the elevators and do not presently have a dispute on a particular fuel-storage regulation. We must still independently assess our subject matter jurisdiction and the ripeness of the parties' claims.

We first consider whether we enjoy our limited subject matter jurisdiction over the parties' requests for declaratory relief. The Constitution requires interstate compacts be approved by Congress.[52] Congressional approval transforms a compact into federal law sustaining our jurisdiction under 28 U.S.C. § 1331.[53]

But our jurisdiction extends only to claims ripe for resolution.[54] "The function of the ripeness doctrine is to determine whether a party has brought an action prematurely, and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine."[55] "The Supreme Court has stated that a claim is ripe for review if it is fit for judicial decision and withholding court consideration of the issue would constitute a hardship to the parties."[56]

The ripeness doctrine's contours "are particularly difficult to define with precision when a party seeks a declaratory judgment."[57] To determine if a claim for a declaratory judgment is ripe, our Court of Appeals instructs us to consider three factors: "the adversity of the parties' interests, the conclusiveness of the judgment, and the practical utility of that judgment."[58] While the parties both believe this case is ripe, we still independently consider these three factors. Applying these factors, we agree the parties' claims are ripe.

We look first to the adversity of the parties' interests. We assess adversity by asking "[w]hether the claim involves uncertain and contingent events or presents a real and substantial threat of harm."[59] The Commission and Secretary both present real and substantial threats of harm. The Commission adduces facts showing the Secretary has attempted and will apply building safety and fuel-pumping regulations on the Commission at its new administration building. The Commission argues compliance with Department regulations will cause it to incur substantial monetary harm. The Secretary cites his duties—to apply Department regulations to ensure buildings in the Commonwealth are safe—and his inability to exercise those duties as a legitimate and substantial threat of harm.

Second, we must consider whether the parties present "sufficiently concrete facts to allow for a conclusive legal judgment."[60] A claim is fit "for adjudication if a 'declaratory judgment would in fact determine the parties' rights, as distinguished from an advisory opinion based on a hypothetical set of facts.'"[61] "Cases presenting predominantly legal questions are particularly amenable to a conclusive determination in a preenforcement context, and generally require less fact development."[62] The Commission adduced sufficiently concrete facts to allow for a conclusive judgment: the Commission built its new administration building in Pennsylvania near

the Scudder Falls Bridge and the Secretary insists the Commission submit to Department safety regulations regarding the building's elevators and fuel-pumping stations at this building.

Third, we consider whether ruling on the parties' request for declaratory relief has utility. "In the context of the Declaratory Judgment Act, utility exists when the judgment would 'materially affect the parties and serve . . . [to] clarify[] legal relationships so that plaintiffs . . . [can] make responsible decisions about the future.'"[63]   A ruling today would provide particular utility.  The Commonwealth, the State of New Jersey, and Congress created the Commission in 1934 with Congress approving in 1935.  Now, eighty-five years later, one of the contracting states argues it may unilaterally regulate the Commission's building located within its sovereign borders. The Commission argues it is not subject to unilateral regulation unless specified in the Compact. Resolving this issue will allow the Commission and the Secretary to make responsible decisions about the future.

### B. Pennsylvania's and New Jersey's congressionally approved Compact creating the Delaware River Joint Toll Bridge Commission.

The parties' claims for a declaratory judgment rest on rights under the Compact creating the Commission. We first inspect law governing interstate agreements.  We then interpret the Compact creating the Commission "under the principles of contract law."[64]  "As with any contract, the analysis begins with 'the express terms of the Compact as the best indication of the intent of the parties.'"[65]  Only when the express terms of the text are ambiguous must we "turn to other interpretative tools to shed light on the intent of the Compact's drafters."[66]

### 1. The purpose of compacts requires we follow their negotiated terms.

Our Framers through the United States Constitution established a federal system, delegating certain political powers to Congress, President, and federal courts and reserving—through the Tenth Amendment—all other powers not prohibited to the states and the people.  The

Framers did not "abolish the sovereign powers of the States, which retained 'a residuary and inviolable sovereignty.'"[67] Instead, the Framers created a system "of dual sovereignty" where "the Federal Government and the States wield sovereign powers."[68]

The States also ratified the Framers prohibiting them "from exercising some attributes of sovereignty" in Section 10 of Article 1.[69] The Framers' prohibitions largely relate to the sovereign rights "to be able to make contracts and give consents bearing upon the exertion of governmental power."[70] In one clause termed the "Contract Clause,"[71] the Framers prohibited a state from "pass[ing] any . . . Law impairing the Obligation of Contracts[.]"[72] This prohibition may include contracts entered by the state with a private party.[73] In another clause termed the "Compact Clause,"[74] the Framers provided: "No State shall, without the Consent of Congress, . . . enter into any Agreement or Compact with another State[.]"[75]

Through the Compact Clause, the Framers set a mechanism to allow states to solve regional problems and address interstate disputes. The Framers mandated these interstate compacts receive congressional consent so Congress could "exercise national supervision" and ensure no interstate agreement would threaten the Federal government.[76] The interstate compacts establish a contractual relationship between the party states protected from impairment by the Contract Clause.[77]

States exercising the sovereign right to enter into interstate compacts may yield certain rights reposed in them by the Framers in the Tenth Amendment.[78] As a seminal commentator in this subject observed: "Just as, for the common peace and welfare, the thirteen, sovereign States, in 1787, were willing to relinquish the sovereign right of immunity from suit, so the American states have, in the succeeding years, found it feasible and desirable, by means of compact, to relinquish the exercise of sovereign rights."[79] "By such compacts, the authority over certain

domestic affairs of one state—part of the police power—a power which the States have never surrendered to the National Government and which they do not desire to so surrender, may be yielded by one State to another, if it shall be deemed to tend to peace and mutual benefit."[80]

With the benefit of studying over two hundred years of compacts, we learn states enter interstate compacts for varied reasons. One reason is the "settlement of boundaries."[81] Another reason is to "deal[] with instances in which the States concerned [are] willing to surrender a rigid insistence on their rights and powers of sovereignty, in order to attain some mutually desirable end."[82] This second type of compact creates "[a] specially created body or department[] and agencies of the member states [to] administer interstate concordats[.]"[83]

There are obvious differences between a boundary compact and a compact creating a commission specifically empowered to address a regional problem.[84] Boundary compacts aim to resolve claims to land; for instance, Virginia and Maryland entered into a compact concerning disputed land around the Potomac River.[85] When states enter into a boundary compact, each state is left to "regulate the activities of her own citizens" unless the states agree otherwise in their compact.[86]

On the other hand, interstate compacts creating a bi-state entity "are not extensions of each compacting state's authority, but are instead formed through each state's surrender of a portion of its sovereignty to the compact entity."[87] "An interstate compact, by its very nature, shifts a part of a state's authority . . . to the agency the several states jointly create to run the compact. Such an agency under the control of special interests or gubernatorially appointed representatives is two or more steps removed from popular control, or even of control by a local government."[88] "Bi-state entities occupy a significantly different position in our federal system than do the States themselves. The States, as separate sovereigns, are the constituent elements of the Union. Bi-state

entities, in contrast, typically are creations of three discrete sovereigns: two States and the Federal Government."[89]

While we are guided by these principles, neither the parties nor we could find a wealth of cases explaining to what degree a state surrenders its sovereign powers by entering an interstate compact creating a bi-state commission. But the few cases we found instruct states may surrender significant aspects of sovereignty by forming a bi-state commission such as this Delaware River Joint Toll Bridge Commission. For example, in *Operating Engineers*, an engineers' union sued this same Commission in federal court for injunctive relief compelling the Commission to comply with New Jersey collective bargaining laws.[90] The District Court for the District of New Jersey granted the Commission summary judgment, holding the states' legislatures did not express "a clear intent to impose their labor laws upon the Commission."[91]

Our Court of Appeals held it would not impose state collective bargaining laws on the Commission absent both states' "express intent to amend the Compact or apply their collective bargaining laws to the Commission's employees."[92] The Court explained the Compact did not address Commission employees' right to collectively bargain. The union argued because the Commonwealth and New Jersey passed similar labor laws allowing collective bargaining, the states intended to amend the Compact applying these laws.

Our Court of Appeals explained no language in the Compact permitted the Commonwealth and New Jersey to amend the Compact by enacting similar legislation. The Court also found no language in the Compact allowing Pennsylvania or New Jersey to modify the Compact through legislation "concurred in" by the other state.[93] The Compact is also "silent" on this ability. The Court refused to adopt the union's argument the states' similar legislation evinced intent to amend the Compact without Congress's approval. Each state's legislation could not bind the Commission

if not allowed for in the Compact approved by Congress or in both of the states' respective laws.[94] Neither the Compact nor Pennsylvania's and New Jersey's labor laws contained "express legislative intent" to apply the labor laws to the Commission.[95] Silence is not consent in this regard. Without "express legislative intent" of both states to impose New Jersey's labor laws on the Bridge Commission in the Compact, our Court of Appeals affirmed the district court's declaration the states' collective bargaining laws did not apply to the Commission.[96]

In *Operating Engineers*, our Court of Appeals cited with approval the New Jersey Supreme Court's decision in *Eastern Paralyzed Veterans*.[97] In *Eastern Paralyzed Veterans*, the Delaware River Port Authority, a different bi-state entity created by compact by Pennsylvania and New Jersey governing bridge and related transportation operations closer to Philadelphia and Camden, and the Camden Housing Authority planned to construct a transit terminal to operate a regional train service crossing the Delaware River between the Commonwealth and New Jersey.[98] A veterans association sued arguing the Port Authority must submit to the New Jersey Uniform Construction Code requiring it install an elevator in the terminal for handicapped persons.[99] The New Jersey trial court granted summary judgment for the veterans association holding the Port Authority must submit to New Jersey's Construction Code. The New Jersey appellate division affirmed.

The New Jersey Supreme Court reversed explaining the Commonwealth and New Jersey created the Port Authority under a compact as a "bi-state entity" meaning neither state "can unilaterally impose additional duties, powers or responsibilities upon the Authority."[100] Neither the Commonwealth nor New Jersey could impose regulations on the Port Authority unless both states expressly agreed.[101] While the New Jersey legislature provided its Construction Code

applied to bi-state entities, the court held it would not impose the Construction Code without a similar express statement of intent from the Pennsylvania General Assembly.[102]

In *Eastern Paralyzed Veterans*, the New Jersey Supreme Court found no support for what other courts referred to as the "internal-external distinction" theory.[103]  This theory posits a single state may not regulate internal operations, but may regulate the external operations, of a bi-state entity.[104]  External operations include laws involving "health and safety, insofar as its activities may externally affect the public."[105]   In declining to apply this theory, the New Jersey Supreme Court explained: "[o]nly when the compact itself recognizes the jurisdiction of the compact states may it be subject to single-state jurisdiction."[106]  This view is consistent with *Operating Engineers* and principles shared by the Supreme Court of the United States: "Each State's sovereign will is circumscribed by that of the other States in the compact and circumscribed further by the veto power relinquished to Congress in the Constitution."[107]

Against this backdrop, we review the negotiated and congressionally approved Compact terms. Unlike *Operating Engineers*, we are not addressing an amendment by state conduct without Congressional approval.  Like *Eastern Paralyzed Veterans*, we must examine the negotiated and congressionally approved Compact's terms.

## 2.    We define the parties' rights by interpreting the Compact terms.

The parties assert various textual and policy arguments in support of their respective positions.  We attempt to categorize the arguments.  Mindful of our review begins with the Compact terms, the parties' dispute largely relates to the powers surrendered to the Commission in the Compact.  The Commission argues the states gave it broad authority to control its buildings; the Secretary argues the states unambiguously limited the Commission's authority to powers exercised by a "natural person," while also limiting the Commission's powers to only control

bridges within its authority, which did not extend the Commission's authority to administration buildings. The Secretary also asserts the Compact has an ambiguous term requiring us to consider extrinsic evidence. The second fundamental argument relates to unilateral state regulation of the Commission. The Commission argues the Compact unambiguously does not contemplate state agencies like Pennsylvania's Department of Labor & Industry unilaterally regulating the Commission; the Secretary argues the Compact's unambiguous silence about state regulation is proof the states did not expressly surrender their sovereignty.

We must analyze the parties' arguments by looking to the text of the Compact. "Interstate compacts are construed as contracts under the principles of contract law."[108] "As with any contract, the analysis begins with 'the express terms of the Compact as the best indication of the intent of the parties.'"[109] Only when the text is ambiguous must we "turn to other interpretative tools to shed light on the intent of the Compact's drafters."[110]

We find the elected representatives of Pennsylvania and New Jersey delegated broad authority to the Commission to control and make improvements to the building, which supersede the Secretary's ability to enforce elevator safety and fuel-storage regulations to the Commission's administration building at the Scudder Falls Bridge. We also find the states did not reserve Pennsylvania's ability to regulate construction and improvement of the Commission's property.

**a. The Compact delegates authority to the Commission to maintain and improve its real property.**

We first review the powers Pennsylvania and New Jersey granted to the Commission to determine if the powers expressly relinquish the states' sovereign police powers over building maintenance and operations. We find they do.

The states granted the Commission the authority to "acquire, own, use, lease, operate, and dispose of real property and interest in real property, and to make improvements thereon."[111] The Compact defines:

> The term "real property," as used in this compact, includes lands, structures, franchises, and interests in land, including lands under water and riparian rights, and any and all things and rights usually included within the said term, and includes not only fees simple and absolute but also any and all lesser interests, such as easements, rights of way, uses, leases, licenses, and all other incorporeal hereditaments, and every estate, interest or right, legal or equitable, including terms of years and liens thereon by way of judgments, mortgages, or otherwise, and also claims for damage to real estate.[112]

The Supreme Court instructed when interpreting a contract, language in the contract "presumably takes its ordinary meaning[.]"[113] The Supreme Court employs the same rules when interpreting statutory language.[114] The term "real property" takes its ordinary meaning: "Real property can be either corporeal (soil and buildings) or incorporeal (easements)."[115] The word "structure" also takes its ordinary meaning: "[a]ny construction, production, or piece of work artificially built up or composed of parts purposefully joined together."[116]

Applying these bedrock principles, Pennsylvania and New Jersey granted the Commission with the authority to acquire and make improvements to its real property, including the Commission's administration building at Scudder Falls Bridge. The states also empowered the Commission "[t]o determine the exact location, system, and character of, and all other matters in connection with, any and all improvements or facilities which it may be authorized to own, construct, establish, effectuate, maintain, operate or control."[117]

The compacting states then agreed to forfeit their sovereign power in these limited aspects and authorize the Commission:

> To exercise all other powers, not inconsistent with the Constitutions of the States of Pennsylvania and New Jersey or of the United States, which may be reasonably necessary or incidental to the effectuation of its authorized purposes or to the exercise of any of the foregoing powers, except the power to levy taxes or

19

assessments for benefits; and generally to exercise, in connection with its property and affairs and in connection with property under its control, any and all powers which might be exercised by a natural person or a private corporation in connection with similar property and affairs.[118]

The Commonwealth and New Jersey grant the Commission "all other powers, not inconsistent with the Constitutions of the States of Pennsylvania and New Jersey or of the United States[.]"[119] The states authorize this extensive grant to the Commission to carry out "any of the foregoing powers" including the power to make improvements to its real property. The ordinary meaning of "all other powers" does not provide a limitation retaining the Commonwealth's police power. We cannot read the Commission's authority to make improvements to its real property as being conditioned on approval from either compacting state. This interpretation defies the text agreed by the two states. To read the Compact in the manner suggested by the Secretary would be, like expanding amendments in *Operating Engineers*, adding language not agreed by Pennsylvania and New Jersey or approved by Congress.

### *The Secretary's arguments are belied by the Compact language.*

To overcome this direct language, the Secretary raises several arguments. First, he reads the "all other powers" grant different than the Commission. The Secretary argues the second clause granting powers exercised "by a natural person or a private corporation" limits the first clause. Because he reads the second clause to limit the first clause, the Secretary argues the Commission must submit to the Department's regulations just like a private corporation. The Secretary argues the provision is superfluous unless read as a limitation.

We disagree with the Secretary's reading. We read the second clause as an additional grant of authority to the Commission because the word "and" connects these clauses in the later grant. This grant is not superfluous: it enables the Commission to exercise powers on its property "which might be exercised by a natural person or a private corporation" *even if* these powers are not within

express purposes or powers otherwise granted to the Commission.  We consider this the only natural reading and find its meaning unambiguous.

We also note the compacting states understood the plain language of the sweeping grant of authority they provided to the Commission in this clause.  They specifically carve out the Commission's power to "levy taxes."[120]  The compacting states unambiguously granted the Commission the authority to construct and operate its authorized buildings without intervention from the compacting states.

Second, the Secretary then argues the Commission cannot operate buildings without state regulation because operating buildings is too attenuated from the core purpose of the Commission to operate and maintain bridges.  We can only assess the purposes and powers of the Commission as specified by the compacting states in the Compact.  The states unambiguously state one of the core purposes of the Commission is to administer bridges.  To carry out its purposes, including the purpose of administering bridges, the states consented to the Commission's use and occupation of any "real property of the said two states, or of either of them, which may become necessary or convenient[.]"[121]  The states then unambiguously authorized the Commission all powers to acquire and improve its real property.  It did not limit the Commission's powers to "bridges," which the states separately define as "approach highways and interests in real property necessary. . . to facilitate the flow of traffic . . . , or to connect such bridge with" other roads.[122]  We find it significant the compacting states drew clear distinctions between "real property" and "bridges."[123]

At oral argument, the Secretary focused on a third basis to avoid the power surrendered to the Commission in the Compact: the Commission's planned conduct is inconsistent with the United States Constitution and thus excepted from the broad grant of authority.  We do not see inconsistency.  Our Framers designed the Constitution to reserve certain powers to the states under

the Tenth Amendment. Our Framers also expressly granted the states the right—but not the mandate—to be able to bind together with other states to address regional problems by creating interstate entities not controlled by either state. Our Framers left it to the states to negotiate creations of interstate entities and define the powers and rights granted to new third interstate entities which are not citizens or under the control of either state. The Framers only limited the states' rights by requiring an interstate compact receive Congress's consent to become federal law. When forming an interstate compact, a state is left to negotiate its desires to regulate the bi-state entity's function within its borders. But once the state agrees to the terms forming the compact, the state relinquishes its unilateral control because the third entity now operates as an instrumentality of multiple states unless the compact reserves each state's authority. If it does not, both compacting states must consent to unilaterally regulate the interstate entity. The Secretary's argument would nullify the Compact Clause.

And in this Compact, the states announce the entity they form. The states create the Commission as "a body corporate and politic" and "the public instrumentality" of the two states.[124] The states declare the Commission should develop additional bridge facilities "without the expenditure of large sums from the public revenues."[125] The states also agree it be "highly desirable that there be a single agency for both states empowered to further the transportation interests of these States with respect to that part of the Delaware River north of the stone arch bridge of the Pennsylvania Railroad from Morrisville to Trenton[.]"[126] The Compact's express terms confirm the elected representatives' agreement for this bi-state commission to not be subject to one state's unilateral regulations as to building operations and management.

### b. The Compact is not silent as to the Commonwealth's power to regulate the Commission's buildings, and the states did not reserve sovereign police power as to powers expressly granted to the Commission.

The Secretary argues because the Compact does not give the Commission this power, this silence must be read as reserving this sovereign power with Pennsylvania (at least as to property in Pennsylvania). The Secretary argues the Compact does not immunize the Commission from Pennsylvania building regulations, regardless of New Jersey's view. He believes the Commission must submit to Department regulations because these regulations are an exercise of Pennsylvania's sovereign police power to regulate the health and safety of its citizens. Despite the language granting "any and all powers" to the Commission to carry out its purposes and powers including maintaining and operating its buildings, the Secretary argues there is silence in the Compact on this issue. He then argues this silence means Pennsylvania retains its regulatory authority because the states did not "expressly relinquish[] . . . sovereignty 'in terms too plain to be mistaken.'"[127]

The Secretary argues he retains sovereignty to regulate building improvements in Pennsylvania notwithstanding the Compact citing *Virginia v. Maryland* and *Tarrant Regional Water Dist. v. Herrmann*, "if any inference is to be drawn from such silence, it would be that each State was left to regulate the activities of her own citizens[.]"[128] We distinguish these cases. They do not instruct a bi-state agency is a "citizen" subject to unilateral regulation. We see no authority for treating a bi-state entity as a citizen of a single state, especially when created as a "body corporate and politic" of both states. These are boundary cases where states disputed whether they surrendered certain claims to land or water by agreeing to a compact.

We disagree with the Secretary's starting point: if the Compact is silent on this specific power, then the compacting states can invoke their police power. This is not how we interpret compacts. We read compacts as contracts. The plain language grants the Commission power over

its property, including its building improvements, subject to limiting its eminent domain power consistent with the law of each state. We are not faced with a power claimed by one of the compacting states which is arguably not addressed in the Compact. We are only faced with compacting states agreeing to a specific grant of authority to a bi-state entity accompanied by another specific grant of "any and all powers" to carry out this same authority.

Despite the broad grant of authority to the Commission, the Secretary cannot point to language in the Compact reserving Pennsylvania's power to regulate building improvements in the Commission's buildings. The Secretary cites Compact language outlining how the Commission may exercise its eminent domain powers as proof the parties did not intend to grant the Commission sovereign police powers—otherwise, the parties would have specifically described how the Commission may exercise those powers as it specifically described how the Commission may exercise eminent domain.[129] The Secretary's argument does not specifically address language relating to the state's sovereign police powers of ensuring safety and asks us to assume the parties' intent based on an unrelated power delegated to the Commission.[130]

Pennsylvania could have, consistent with the Compact, reserved its power to regulate building improvements as it did with the power to levy taxes, apply its laws of eminent domain, and protect local police authority. For example, we contrast the Compact's silence on the states' sovereign police power over building improvements to the Interstate Oil & Gas Compact Commission, another interstate compact entered by Pennsylvania. Originally formed in 1935, Pennsylvania joined the Interstate Oil & Gas Compact in 1961.[131] Congress approved the Compact in 1969.[132] The compacting states aimed to work together to efficiently extract natural resources but specified the listed subjects of the Compact "shall not limit the scope of the authority of any state."[133]

The Compact creating the Commission does not expressly reserve the compacting states' scope of authority as to building improvements. The states addressed police power relating to the local municipalities regulating local roads.[134] The Secretary cannot credibly argue the two states knew how to reserve police power in one section of the Compact but failed to do so in another section.[135]

Our Court of Appeals cautioned in interpreting the Compact we "may not read into [the Compact] language or intent that is simply not there."[136] We see no language expressing the intent of single state regulation or expressly reserving the compacting states' sovereign police power despite the wide authority granted to the Commission.

We are also not persuaded by the Secretary's argument a sovereign state must expressly relinquish its authority in a Compact to be effective. First, as we describe above, the states surrendered the power over improving and maintaining Commission property to the Commission. Second, the Secretary's cited principle—that a state must relinquish sovereign rights "in terms too plain to be mistaken"—is taken from a Civil War-era case involving a state contracting with a bank under the Contract Clause; it did not involve the Compact Clause. This Contract Clause principle announced in *Jefferson Branch Bank v. Skelly* would only offer a mode of interpretation when presented with ambiguous terms.[137] The Court in *Skelly* was not tasked with reviewing an interstate compact under the Compact Clause, but rather an issue presented under the Contract Clause as to whether Ohio surrendered its sovereignty when authorizing a private banking company by contract. Our context is entirely distinct.

In our Compact Clause analysis, this *Skelly* principle does not define the sovereign's ability to regulate a bi-state commission when the states clearly define the Commission's powers and purposes as including power over operating and maintaining the Commission's buildings. We see

an example from the standard of review announced by our Court of Appeals in *Wayne Land*: "As with any contract, the analysis begins with 'the express terms of the Compact as the best indication of the intent of the parties[.]'"[138]

The states agreed to surrender their power to regulate the Commission's building improvements to the Commission. They can negotiate and work to amend their Compact and obtain Congressional approval but, as of today, the Compact must be enforced as written without a judge crafting language differing from the elected representatives' negotiated terms.

**3. We do not look at course of performance because the Secretary fails to show the Compact contains ambiguous terms.**

In addition to arguing the states did not surrender this authority despite the express Compact language, the Secretary also argues we should find the Compact is ambiguous. If the text of the Compact is ambiguous, we must then 'turn to other interpretative tools to shed light on the intent of the Compact's drafters.' One of those interpretative tools is the background notion 'that states do not easily cede their sovereign powers[.]'"[139] The Secretary argues the custom and practices over the last eighty-six years can inform our review of the asserted ambiguity; in other words, the Commission never asserted its rights before consistent with the Secretary's view of the states' intend so why can it do so now.

We agree with the Secretary if we found ambiguity.[140] But as we do not see an ambiguity in the Compact, we do not turn to other these other interpretative methods when considering whether the states secretly retained their respective sovereign police power rights so as to allow the Secretary to unilaterally regulate the Commission's building improvements. We cannot read certain language of the Compact to mean the compacting states contemplated single state regulation when the Compact includes no language to this effect.

The Secretary argues the Commission acquiesced to his Department's building safety regulations for decades, showing a "course of performance" which would define the terms in the Compact when interpreted as a contract. We treat compacts "as contracts under the principles of contract law."[141] We may look at extrinsic evidence including "the parties' course of performance under the Compact" if the terms are ambiguous.[142] The Secretary fails to identify ambiguous language in the Compact. We independently find no ambiguous language.

"All other powers" takes its ordinary meaning: all powers, including any police power the Commonwealth unsuccessfully claims it retained, to carry out powers granted to the Commission. The Secretary fails to show it retained police power to regulate the Bridge Commission's elevators or fuel-pumping stations. We decline to add language not agreed by the elected officials of the Commonwealth and New Jersey.

We do not need to review the largely undisputed course of conduct. The Framers set the standard and Pennsylvania's and New Jersey's elected representatives defined the powers surrendered to the Commission including surrendering certain rights regarding the Commission's buildings to the joint bilateral Commission.

## III. Conclusion

Our "'first and last order of business is interpreting the compact[;]' we may not read into it language or intent that is simply not there."[143] Pennsylvania and New Jersey created the Commission by Compact in 1934. Congress approved in 1935. The states agreed to grant the Commission "all other powers" to carry out its powers and purposes. The states granted the Commission the power to operate and maintain its real estate. The states did not reserve their sovereign powers to regulate the Commission. Pennsylvania now argues it retains sovereign rights it surrendered in 1934. They could get it back. But the states have not agreed to do so. As our

Court of Appeals instructed in *Operating Engineers*, Pennsylvania and New Jersey may amend the Compact to provide for unilateral state regulation of Commission buildings. But without an amendment to the Compact approved by Congress, the Secretary may not force the Commission to submit to Pennsylvania's elevator or fuel-storage regulations and laws after it unequivocally surrendered it sovereign authority over maintaining and operating Commission property in the Compact. We grant summary judgment to the Commission to declare its rights under the Compact to be free from the Secretary's interference as to elevator operations and fuel storage at the Scudder Falls administration building complex through the accompanying Order.[144]

---

[1] Our Policies require a statement of undisputed material facts and an appendix of exhibits in support of a Rule 56 motion. The Commission filed a statement of undisputed material facts and appendix in support of its motion for summary judgment. *See* ECF Doc. No. 42. Secretary Oleksiak filed a statement of undisputed material facts and appendix in support of his motion for summary judgment. *See* ECF Doc. No. 43. We reference the Commission's Statement of Undisputed Facts as "Comm'n SUMF" and its appendix as "Comm'n App." We reference the Secretary's Statement of Undisputed facts as "Sec'y SUMF" and his appendix as "Sec'y App."

[2] Delaware River Joint Toll Bridge Commission: 2016 Annual Report, https://www.njleg.state.nj.us/OPI/Reports_to_the_Legislature/DRJTBC_AR_2016.pdf.

[3] *Id.*

[4] *Id.*

[5] 1919 Pa. Laws 148, Sec. 1; 1912 N.J. Laws 1594–97.

[6] Delaware River Joint Toll Bridge Commission: 2016 Annual Report, *supra.*

[7] *Id.*

[8] Sec'y App. 88a, Article III.

[9] ECF Doc. No. 1 at ¶¶ 18–19; ECF Doc. No. 17 at ¶¶ 18–19.

[10] ECF Doc. No. 1 at ¶ 20; ECF Doc. No. 17 at ¶ 20.

[11] Sec'y App. 35a–38a (ECF Doc. No. 43-3).

[12] *Id.* at 31a.

[13] *Id.* at 35a–38a.

[14] *Id.*

[15] *Id.*

[16] *Id.* at 76a.

[17] *Id.*

[18] *Id.*

[19] *Id.* at 35a–38a.

[20] Pennsylvania's Department of Labor & Industry is a cabinet-level agency administering and monitoring many regulatory programs including through its Bureau of Occupational and Industrial Safety, which "administers and enforces the Uniform Construction Code, Fire and Panic Law, Universal Accessibility Law, Energy Conservation Law, General Safety Law, Boiler Law, Elevator Law, Liquefied Petroleum Gas Law, Flammable & Combustible Liquids Law, Asbestos and Lead Laws, Bedding and Upholstery Law, Stuffed Toy Law and Private Employment Agency Licensing Law." Laws and Regulations Home, *Department of Labor & Industry*, https://www.dli.pa.gov/laws-regs/Pages/default.aspx.

[21] ECF Doc. No. 17 at ¶ 40 (citing 34 Pa. Code § 403.42a).

[22] *Id.*

[23] *Id.* (citing 34 Pa. Code § 403.81).

[24] Sec'y App. 512a (ECF Doc. No. 43-4).

[25] ECF Doc. No. 12-2 at p. 18. The Department's Deputy Secretary of Safety and Labor-Management Relations, Jennifer L. Berrier, authored this letter. *Id.*

[26] *Id.*

[27] *Id.* (citing 35 P.S. § 7210.102(b)(1); 34 Pa. Code § 403.34(b)).

[28] *Id.* at p. 19.

[29] ECF Doc. No. 1.

[30] ECF Doc. No. 16.

[31] ECF Doc. No. 17 at ¶¶ 242–78.

[32] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute

about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Services*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). On a motion for summary judgment, "we view the facts and draw all reasonable inferences in the light most favorable to the nonmovant." *Pearson*, 850 F.3d at 533-34 (3d Cir. 2017) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hospital of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Id.* (citing *Celotex Corp.*, 477 U.S. at 322-323).

[33] ECF Doc. No. 1 at ¶ 20; ECF Doc. No. 17 at ¶ 20.

[34] Sec'y App. 53a (ECF Doc. No. 43-3).

[35] *Id.* Congress did not consent to the 1953 Compact Amendments when approving the supplemental agreement in 1987. *See* H.R. 2, 100th Cong. § 151 (1987) (enacted). At oral argument, the Commission conceded the 1953 Compact Amendments are not operative without the consent of Congress. The Secretary attaches a copy of the Compact highlighting the changes proposed 1953 Compact Amendments. *See* Sec'y App. 82a-96a (ECF Doc. No. 43-3). We cite this version of the Compact throughout this Memorandum because the 1953 Amendments, while never consented to by Congress, are still reflected in the statutory codes of Pennsylvania and New Jersey. *Compare* 36 Pa. Stat. Ann. § 3401 *and* N.J. Stat. Ann. § 32:8-1 *with* Sec'y App. 82a-96a (ECF Doc. No. 43-3). The 1953 amendments contain important language delegating the Commission with additional purposes and powers. *See Delaware River Joint Toll Bridge Commission: Hearing on H.R. 5347 and H.R. 6199 Before the H. Interstate and Foreign Commerce Committee*, 88th Cong. 17 (1963) (statement of Representative Willard S. Curtin). For instance, the 1953 amendments expand the Commission's purposes to include: "The acquisition, construction, administration, operation and maintenance of such port and terminal facilities within the district as the commission may deem necessary to advance the interests of the two states[.]" *See* Sec'y App. 84a (ECF Doc. No. 43-3).

The Secretary did not raise this issue when opposing the Commission's request for a preliminary injunction July 2019. In then granting injunctive relief to the Commission, we looked to the Compact as reflected in Pennsylvania's statutory code. *See* ECF Doc. No. 15. We now understand the compacting state statutes contain language we cannot consider because Congress never approved this 1953 language.

[36] *See* Joseph F. Zimmerman, *Interstate Cooperation: Compacts and Administrative Agreements* 59 (2nd ed. 2002) ("All proposed compact amendments must pass through what can be termed the hazardous process of obtaining their enactment by each state legislature, approval of each

governor, consent of Congress, and approval of the president if the original compact received such approval.").

[37] Sec'y App. 83a (ECF Doc. No. 43-3), Article I.

[38] *Id.* As the states defined "bridge" in the Compact:

> The word "bridge" . . . shall include such approach highways and interests in real property necessary thereto in said Commonwealth or said State as may be determined by the commission to be necessary to facilitate the flow of traffic in the vicinity of any such bridge, or to connect such bridge with the highway system or other traffic facilities in said Commonwealth or said State: Provided, however, That the power and authority herein granted to the commission in connection with the approach highways shall not be exercised unless and until the Department of Highways of the Commonwealth of Pennsylvania shall have filed with the commission its written approval as to approach highways to be located in said Commonwealth and the State Highway Department of the State of New Jersey shall have filed with the commission its written approval as to approach highways to be located in said State.

*Id.* at 91a, Article X.

[39] *Id.* at 82a, Article I.

[40] *Id.* at 84a, Article II.

[41] *Id.*, Article II(b).

[42] *Id.* at 85a, Article II(h).

[43] *Id.*, Article II(j).

[44] *Id.* at 85a, Article II(m). In Article III of the Compact, the states specify the Commission may exercise its eminent domain power in each state consistent with the respective Pennsylvania and New Jersey laws granting eminent domain authority to the earlier Joint Commission. *Id.* at 88a, Article III.

[45] *Id.* at 86a, Article II(n).

[46] *Id.*, Article II(p).

[47] *Id.* at 90a, Article VIII.

[48] *Id.* at 88a, Article III.

[49] *Id.* at 93a, Article X(d):

> The commission may enter upon, use, occupy, enlarge, construct and improve, any street, road or highway, located within the limits of any municipality, and deemed by the commission to be necessary in connection with the acquisition, construction, improvement, maintenance or operation, of any bridge, owned or operated by the commission, or of any bridge approaches, bridge plazas, or approach highways to any such bridge, subject however to the consent of the governing body of such municipality, and to such reasonable police regulations as may be established by such governing body.

[50] *Id.* at 86a, Article II(p).

[51] To the extent the parties seek a declaration beyond this question, these requests fail to present an "actual controversy," *see* 28 U.S.C. § 2201, or are not ripe for our review under the framework announced by our Court of Appeals for determining the ripeness of requests for declaratory relief applied in Section II.A of this Memorandum.

[52] U.S. Const. art. I, § 10, cl. 3 ("No State shall, without the consent of Congress … compact with another State.").

[53] *Tarrant Reg'l Water Dist. v. Herrmann*, 569 U.S. 614, 620 (2013); *Wayne Land & Mineral Grp. LLC v. De. River Basin Comm'n*, 894 F.3d 509, 521 (3d Cir. 2018).

[54] *Peachlum v. City of York*, 333 F.3d 429, 433 (3d Cir. 2003).

[55] *Id.*

[56] *Id.* at 434 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105, (1977)).

[57] *Wayne Land*, 894 F.3d 509 at 527 (quoting *Marathon Petroleum Corp. v. Sec'y of Fin. for Del.*, 876 F.3d 481, 496 (3d Cir. 2017)).

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.* (quoting *Surrick v. Killion*, 449 F.3d 520, 527 (3d Cir. 2006)).

[62] *Id.* (quoting *Surrick*, 449 F.3d at 527).

[63] *Id.* (quoting *Surrick*, 449 F.3d at 529).

[64] *Tarrant*, 569 U.S. 614, 620 (2013).

[65] *Wayne Land*, 894 F.3d at 527 (quoting *Tarrant*, 569 U.S. at 628).

[66] *Tarrant*, 569 U.S. at 620.

[67] *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475 (2018) (quoting The Federalist No. 39, p. 345 (C. Rossiter ed. 1961)).

[68] *Id.* (citing *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991)).

[69] *Id.*

[70] *U.S. v. Bekins*, 304 U.S. 27, 51-52 (1938).

[71] *See, e.g., U.S. v. Winstar Corp.*, 518 U.S. 839, 873 (1996) (referring to U.S. Const. art. I, § 10, cl. 1 as the "Contract Clause").

[72] U.S. Const. art. I, § 10, cl. 1.

[73] *See Jefferson Branch Bank v. Skelly*, 66 U.S. 436 (1861).

[74] *See, e.g., U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 472 (1978) (referring to U.S. Const. art. I, § 10, cl. 3 as the "Compact Clause").

[75] U.S. Const. art. I, § 10, cl. 3.

[76] Marian E. Ridgeway, *Interstate Compacts: A Question of Federalism* 27 (1971).

[77] Joseph F. Zimmerman, *Interstate Cooperation: Compacts and Administrative Agreements* 35 (2nd ed. 2002).

[78] *See Bekins*, 304 U.S. at 52 ("The reservation to the States by the Tenth Amendment protected, and did not destroy, their right to make contracts and give consents where that action would not contravene the provisions of the Federal Constitution.").

[79] Charles Warren, *The Supreme Court and Sovereign States* 70 (1924).

[80] *Id.* at 74.

[81] *Id.* at 70.

[82] *Id.*

[83] Joseph F. Zimmerman, *Interstate Cooperation: Compacts and Administrative Agreements* 75 (2nd ed. 2002)

[84] Felix Frankfurter & James M. Landis, *The Compact Clause of the Constitution—A Study in Interstate Adjustments*, 34 Yale L.J. 685, 696 (1925).

[85] *Id.* at 696 n. 43.

[86] *Virginia v. Maryland*, 540 U.S. 56, 67 (2003).

[87] *Int'l Union of Operating Engineers, Local 542 v. De. River Joint Toll Bridge Comm'n*, 311 F.3d 273, 276 (3d Cir. 2002).

[88] *Hess v. Port Author. Trans-Hudson Corp.*, 513 U.S. 29, 42 (1994) (quoting Marian E. Ridgeway, *Interstate Compacts: A Question of Federalism* 300 (1971)).

[89] *Id.* at 40. As Professor Ridgeway explains:

> It is clear that an interstate compact agency takes orders only from parent states acting in unison, not from an individual state party to the compact acting unilaterally. This means that if an agency such as the Port Authority [of New York and New Jersey] takes independent legal action in a matter such as acquisition of land thirty miles outside its legal geographical boundaries for the location of an airport, the people of one state may strenuously object only to find that the people of the other state or states are delighted or are, more generally, indifferent to the matter. If such a situation were an ordinary decision of a county or a municipality, the people directly concerned would be able through established political channels to take action for or against the decision. Likewise, an objecting state could control its municipal corporation so acting. In interstate compact agencies, Congress has provided the public with the image of a protector of interstate interests, a general supervisor, a guarantor that respective state and local rights and desires will not be overridden by a powerful agency independent of any single state's control. By removing Congress from this role, or emasculating its and the public's conceptions of its role, the courts in effect create a totally new governmental entity, independent and unrestrained by any government superior to it.

Marian E. Ridgeway, *Interstate Compacts: A Question of Federalism* 39-40 (1971).

[90] *Operating Engineers*, 311 F.3d at 275.

[91] *Id.* at 274.

[92] *Id.* at 280.

[93] *Id.*

[94] *Id.*

[95] *Id.* at 281.

[96] *Id.* at 276.

[97] *Id.* at 281 (citing *Eastern Paralyzed Veterans Ass'n Inc. v. City of Camden*, 545 A.2d 127, 128 (N.J. 1988)).

[98] *Eastern Paralyzed Veterans*, 545 A.2d at 128.

[99] *Id.* at 130.

[100] *Id.* (quoting *Nardi v. De. River Port Auth.*, 490 A.2d 949, 950 (Pa. Commw. Ct. 1985)).

[101] *Id.* at 132.

[102] *Id.* at 134. In *Eastern Paralyzed Veterans*, the New Jersey Supreme Court also considered whether the Delaware River Port Authority impliedly consented to New Jersey's Uniform Construction Code regulations by participating in a project with a New Jersey entity subject to New Jersey regulations (the Camden Housing Authority). *Id.* The Court remanded the case to allow fact inquiry into this question. *Id.* As we are not presented with the Commission acting in tandem with an entity subject to Pennsylvania regulations, we do not consider this part of the Court's analysis pertinent. The Secretary argues implied consent but only to show as a form of extrinsic evidence aiding our interpretation of the Compact. We may not use custom to vary from terms of the Compact if not ambiguous.

[103] *Id.* at 132 (citing *Agesen v. Catherwood*, 260 N.E.2d 525 (N.Y. Sup. Ct. 1970)).

[104] *Id.*

[105] *Id.* (quoting *Eastern Paralyzed Veterans*).

[106] *Id.*

[107] *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 312–16 (1990) (Brennan, J., concurring).

[108] *Tarrant*, 569 U.S. at 620.

[109] *Wayne Land*, 894 F.3d at 527 (quoting *Tarrant*, 569 U.S. at 628).

[110] *Id.*

[111] Sec'y App. 85a (ECF Doc. No. 43-3), Article II(j).

[112] *Id.* at 88a, Article III.

[113] *DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 469 (2015).

[114] *Hardt v. Reliance Standard Life Insurance Co.*, 560 U.S. 242, 251 (2010) ("[W]e begin by analyzing the statutory language, 'assum[ing] that the ordinary meaning of that language accurately expresses the legislative purpose.'").

[115] *Property*, Black's Law Dictionary (11th ed. 2019); *see also* 34 Pa. Code § 401.1 (defining building as a "structure used or intended for supporting or sheltering any occupancy.").

[116] *Structure*, Black's Law Dictionary (11th ed. 2019); *see also* 34 Pa. Code § 401.1 (defining structure as "[a] combination of materials that are built or constructed with a permanent location or attached to something that has a permanent location.").

[117] Sec'y App. 86a (ECF Doc. No. 43-3), Article II(n).

[118] *Id.*, Article II(p).

[119] *Id.* The parties do not argue any provision of the Constitution of Pennsylvania or the Constitution of New Jersey apply to the questions we face today.

[120] *See Jefferson Branch Bank v. Skelly*, 66 U.S. at 446 (1861) ("that neither the right of taxation, nor any other power of sovereignty[.]").

[121] Sec'y App. 88a (ECF Doc. No. 43-3), Article III.

[122] *Id.* at 91a, Article X.

[123] The parties do not ask us whether the Commission had the authority under the Compact to own and construct its administration building. We are only asked if this real property as constructed, owned, and operated by the Commission is subject to Commonwealth regulatory authority. A challenge to the authority of an interstate commission is a separate challenge than the challenge we face today. *See* Marian E. Ridgeway, *Interstate Compacts: A Question of Federalism* 88 (1971) ("In October 1954 the Madison County (Illinois) state's attorney filed a suit challenging Bi-State's authority to acquire the bridge").

[124] Sec'y App. at 83a (ECF Doc. No. 43-3), Article I.

[125] *Id.* at 82a, Preamble.

[126] *Id.* at 82a–83a, Preamble.

[127] *Operating Engineers*, 311 F.3d at 280 (quoting *Skelly*, 66 U.S. at 446).

[128] ECF Doc. No. 43-1 at p. 15 (quoting *Tarrant*, 595 U.S. at 632).

[129] The parties offer differing reasons why the states included this eminent domain provision specifying which law to apply. The Secretary argues this provision shows the states only intended to relinquish sovereign rights—such as right of eminent domain—when the states specifically address how the interstate agency may use the delegated state sovereign right. The Commission argues this provision shows the states knew their laws would not apply to the Commission absent express reservation.

The historical context reveals the parties may be over-analyzing the states' thought processes in their proffered interpretations. The states originally granted the power of eminent domain to the Joint Commission in the 1910s to acquire privately owned bridges for the two states. The states realized this would not be easy: cars were just starting mass production and mass consumption by the American public. The states understood the Joint Commission would need leverage against private bridge owners, so they both granted the Joint Commission with its sovereign eminent domain authority. The states also considered it rather likely the Joint Commission may ultimately need to use its eminent domain right and detailed specific procedures. *See* 1919 Pa. Laws 148, Sec. 1; 1912 N.J. Laws 1594–97. The Joint Commission was able to acquire bridges for the states. But this original grant of eminent domain seemed to be purely pragmatic.

The states, then in possession of the bridges, empowered today's Commission with bridge ownership and maintenance powers in 1934. The states agreed to grant the Commission with the same eminent domain power held by its predecessor entity. In the Compact, the states direct the Commission to use eminent domain as used by the earlier Joint Commission in the 1910s and 1920s. They specifically cite to the laws creating and empowering the Joint Commission. *See* Sec'y App. 88a (ECF Doc. No. 43-3), Article III.

This history drawn from the Compact confirms the states originally inserted the eminent domain provisions for pragmatic reasons. We do not think it is plausible the states placed this provision in the Compact because it knew of potential other implications of waiving or delegating its sovereign rights. The states originally drafted this provision to enable the Joint Commission to carry out its mission and carried this authority over to the new Commission.

[130] We note the Commission does not claim the Compact delegates it the authority to exercise the states' sovereign power of ensuring health and safety as to any building within its jurisdictional control. The Commission only argues it is free from Pennsylvania's unilateral regulation without its consent at the buildings it owns and operates.

[131] S.J. Res. 54, 91st Cong. (1969) (enacted).

[132] *Id.*

[133] *Id.*

[134] Sec'y App. at 93a, Article X(d).

[135] *See In re New Valley Corp.*, 89 F.3d 143, 149 (3d Cir. 1996) ("A court cannot interpret words in a vacuum, but rather must carefully consider the parties' context and the other provisions in the plan."); *see, e.g.*, *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 497 (1992) (explaining Congress's use in one section of a statute of the term "employee" and the term "person entitled to compensation" which courts had interpreted more narrowly shows "Congress intended the two terms to have different meanings").

[136] *Operating* Engineers, 311 F.3d at 280.

[137] 66 U.S. 436 (1861).

[138] *Wayne Land*, 894 F.3d at 527 (quoting *Tarrant*, 569 U.S. at 620).

[139] *Id.* (quoting *Tarrant*, 569 U.S. at 620).

[140] The Secretary adduces largely undisputed evidence the Commission sought, and obtained, the Commonwealth's approval for a variety of similar issues over the Compact's history. The Commission did not timely challenge the accuracy of this evidence and we today deny its motion for leave to untimely challenge as untimely and moot. The Commission's argument is based on the Law governing the Compact. We agree with the Commission as to declaratory relief. We cannot read ambiguity into the Compact and the history is not material.

[141] *Tarrant*, 569 U.S. at 628.

[142] *Id.*

[143] *Operating Engineers*, 311 F.3d at 276 (quoting *Texas v. New Mexico*, 462 U.S. 554, 567–68 (1983)).

[144] The Commission withdrew its request for injunctive relief at oral argument.